UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 08-96-GFVT

UNITED STATES OF AMERICA                                                    PLAINTIFF

V.                              RECOMMENDED DISPOSITION

TRAVIS C. PHILLIPS                                                          DEFENDANT

\* \* \* \* \*

The Court considers a Motion to Suppress filed by Defendant Travis C. Phillips.[1] *See* DE #20 Motion. Defendant, through counsel, moved to suppress information he gave to three different corrections officers that interviewed him in connection with an alleged prison assault. *See id.* In brief, Defendant argued that the officers secured statements from him in violation of *Miranda*. *See id.* at 6. The United States responded in opposition. *See* DE #22 Response. The Court held a lengthy evidentiary hearing and subsequently permitted counsel to file a supplemental brief concerning a fourth interview, this one between Defendant and an FBI Special Agent. *See* DE #25 Minute Entry. Both Phillips and the United States timely filed supplemental briefs. *See* DE #30 Supplemental Memorandum; #34 Supplemental Response. Having reviewed the briefs and arguments submitted by counsel, the Court recommends that the District Court GRANT the motion as to the information obtained in the three interviews conducted by the corrections officers but DENY the motion as to information obtained by the FBI Special Agent.

---

[1] Defendant Hughes did not join the motion.

**I. Background Information**

In July 2008, Defendant Phillips and Co-Defendant Chad Robert Hughes were inmates at United States Penitentiary, McCreary. They stand indicted for violating 18 U.S.C. § 113(a)(6) and 18 U.S.C. § 2 in relation to a serious assault on a fellow USP McCreary inmate. *See* DE #1 Indictment. The United States alleges that on July 2, 2008, at approximately 7:00 p.m., the two Defendants, acting together, assaulted inmate Jeffrey Thiemig in the corridor outside the prison dining area and in front of the softball field. *See* DE #22 Response. Upon hearing a radio transmission, USP Lt. Tom Long and other officers rushed to the scene. As one of the first officers present, Long actually witnessed the assault and ordered Defendants to stop and get down, an order with which Phillips and Hughes complied. *See* DE #28 Transcript ("Tr.") at 24-25. In accordance with standard operating procedure, responding officers placed Defendants in restraints while Long "took control" of the victim. *See id.* at 26-27. After the officers cleared the area of other inmates, they escorted Defendants to the nearby lieutenant's office. *See id.* at 32-34.

After ensuring that the victim received appropriate medical attention, Long, again in accordance with standard procedure, went to the office to speak with Phillips and Hughes. *See id.* at 34-35. Without providing *Miranda* warnings, Long proceeded to inquire as to the purpose or motivation behind the assault and any group (gang) affiliation of Phillips. *See id.* at 37-38. While Hughes provided Long some information regarding the motivation for the assault, Phillips refused to say anything beyond a denial both of his involvement and of any gang affiliation. *See id.* at 38. According to Long, the sole purpose of this inquiry was to determine whether the assault was an isolated incident. *See id.* at 35.

Soon after, officers transferred Defendants to the Special Housing Unit ("SHU"), placing

2

them in temporary holding cells to await permanent placement in the SHU, or the "jail within the jail." *See id.* at 56-57. During this time, SIS (Special Investigative Services or Section) Technician Wilfredo Rivera, who also had responded to the alarm and photographed the scene, spoke with Phillips at the SHU. *See id.* at 86-88. Another officer escorted Defendant Phillips, rear-restrained per standard operating procedures, to a counselor's office to meet one-on-one with Rivera. *See id.* at 92. Without first providing *Miranda* warnings, Rivera identified himself and asked Phillips questions regarding the reasons for and scale of the assault. *See id.* at 92-93. During this five to fifteen minute interview, Phillips told Rivera that he and Hughes acted alone pursuant to a personal issue. *See id.* at 94, 99. Defendant Phillips also reiterated that he was not affiliated with a gang. *See id.* at 100.

By the next morning, July 3, 2008, the prison had formally transferred Phillips from the general population to the SHU. After reviewing the case file, Lt. Shawn Burchett of the SIS spoke with Defendant in the lieutenant's office in the SHU. *See id.* 141-142. In accordance with SHU policy, Phillips wore restraints while out of his cell. *See id.* At no point did Burchett provide *Miranda* warnings. During the brief interview, Burchett probed the reasons for and any history or third-party involvement in the fight, and Phillips again indicated that the fight was personal and that he was not affiliated with any gang or group. *See id.* at 148-149. According to Burchett, the purpose of the interview was to determine if the assault was related to recent inmate seating disputes in the dining facility or was an attempt by Defendants to gain entry into a white gang. *See id.* at 149.

Finally, in addition to being interviewed by the three USP McCreary officers, Defendant Phillips also spoke to Special Agent James Walsh of the Federal Bureau of Investigation. Walsh made a routine FBI visit to USP McCreary on July 9, 2008. *See id.* at 180. Due to "prison intel" that

suggested a possibility that the July 2 assault was linked to larger issues of gang membership or prison population unrest, Walsh elected to interview Defendants and the victim. *See id.* at 185. In the presence of fellow FBI SA Cory King, Walsh questioned Defendant Phillips, who was restrained, in an office in the SHU. *See id.* at 186; Government Exhibit 6 (Phillips FBI Form 302). Before Walsh asked questions, he read Phillips the *Miranda* rights. Phillips waived, and, per Walsh's request, provided a narrative accounting of the July 2 assault. *See* DE #28 Transcript at 184-85. During this interview, Walsh knew of generically referred to Phillips's prior statements to USP personnel. *See id.* at 189, 193-94.

Through counsel, Defendant Phillips moved to suppress any statements[2] he made to Long, Rivera, and Burchett. *See* DE #20 Motion. Movant characterized all three events as custodial interrogation that violated *Miranda*. In opposition, the United States argued that each of the interviews fell within the "public safety" exception to *Miranda*. Defendant then supplemented, post-hearing, in an effort to exclude evidence gathered via the SA Walsh interview, arguing that the prior *Miranda*-violative interviews rendered Walsh's later warnings ineffective. *See* DE #30 Supplemental Memorandum. The Government counters that Walsh's interview was proper. *See* DE #34 Supplemental Response, at 10.

## II. Legal Standards

### a. *Miranda* Warnings

Authorities must, prior to any custodial interrogation, warn the individual in custody

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if

---

[2] Hearing exhibits include summaries of the statements from all four sources.

4

he so desires.

*See Miranda v. Arizona*, 86 S. Ct. 1602, 1630 (1966). Without the requisite warning, any statement made will not be admissible in a subsequent trial. *See id.* ("[U]nless and until such warnings . . . are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used[.]").

For purposes of *Miranda*, a person is "in custody"when, under the circumstances surrounding the interrogation, the person was under "'formal arrest or [experienced] restraint on freedom of movement' of the degree associated with a formal arrest." *See California v. Beheler*, 103 S. Ct. 3517, 3520 (1983)(quoting *Oregon v. Mathiason*, 97 S. Ct. 711, 714 (1977)). When evaluating a custody inquiry,[3] courts focus on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *See Stansbury v. California*, 114 S. Ct. 1526, 1529 (1994). Thus, even if the officer discloses to the interrogated person his views "concerning the nature of an interrogation . . . [or] the potential culpability of the individual being questioned," such views are relevant to a custody determination only to the extent that they "would have affected how a reasonable person in that position would perceive his or her freedom to leave." *See id.* at 1530.

After hearing the *Miranda* warnings, a person may waive his or her applicable rights so long as the waiver is knowing, voluntary, and intelligent. *See Miranda*, 86 S. Ct. at 1628. The state bears

---

[3] A defendant bears the burden of establishing that a scenario invoked *Miranda's* obligations. *See United States v. Donaldson*, 493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006). Interrogation – police questioning or conduct functionally designed to elicit a response – also must exist for *Miranda* to apply. *See, e.g., United States v. Blackmon*, No. 96-6701, 1998 WL 109992, at *2 (6th Cir. Mar. 3, 1998). Once *Miranda* applies, the Government must prove compliance and valid waiver. *See United States v. Thomas*, 38 F. App'x 198, 202 (6th Cir. 2002).

the burden of proof, and courts examine "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused,"while "'indulg[ing] every reasonable presumption against waiver' of fundamental constitutional rights." *See Johnson v. Zerbst*, 58 S. Ct. 1019, 1023 (1938)(citations omitted); *see also United States v. Pacheco-Lopez*, 531 F.3d 420, 430 (6th Cir. 2008)("[W]hen determining voluntariness, 'the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect[.]'"(quoting *Oregon v. Elstad*, 105 S. Ct. 1285, 1298 (1985)).

### b. Public Safety Exception to *Miranda*

Not every custodial interrogation requires the *Miranda* warning. The existence of a threat to public safety may, depending on the circumstances, afford an exception. *See New York v. Quarles*, 104 S. Ct. 2626 (1984). In *Quarles*, the Supreme Court recognized an exception allowing police officers to ask "questions necessary to secure their own safety or the safety of the public" without first reading *Miranda* warnings to a person in custody. *See id.* at 2633; *id.* at 2631-2632 ("[W]e do not believe that the doctrinal underpinnings of Miranda require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety."). The exception arises when an officer has "a reasonable belief based on articulable facts that [he or she is] in danger." *See United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)("[T]he reasonableness test is objective, not subjective."). However, the public safety exception does not apply if an officer asks "questions designed solely to elicit testimonial evidence from a suspect," *see Quarles*, 104 S. Ct. at 2633, or questions that are "clearly investigatory." *See id.* at n.8.

As the *Quarles* Court noted in several instances, the public safety exception is narrow. *See, e.g., id.* at 2631 ("We hold that *on these facts* there is a 'public safety' exception to . . .

Miranda[.]")(emphasis added); *id.* at 2632 (noting that the Court "recogniz[ed] a *narrow* exception to the Miranda rule in this case") (emphasis added); *id.* at 2630 n.3 (describing holding as one of "limited circumstances" where *Miranda* would not apply); *see also United States v. Liddell*, 517 F.3d 1007, 1010 (8th Cir. 2008)(Gruender, J., concurring) (writing separately out of "concern that [8th Circuit] decisions applying the public safety exception to *Miranda* have strayed from the Supreme Court's tethering of the exception to the existence of exigent circumstances"). Significantly, the Sixth Circuit has **strictly** confined the exception, stating that an officer,

> to have a reasonable belief that he is in danger, . . . must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it. The public safety exception applies *if and only if* both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety.

*See United States v. Williams*, 483 F.3d 425, 428 (6th Cir. 2007)(emphasis added).

Thus, in this Circuit, *Quarles* applies only to an exigency involving a weapon. *See Liddell*, 517 F.3d at 1013 (noting strict rule in Sixth Circuit); *United States v. Williams*, 272 F. App'x 473, 477 (6th Cir. 2008)(describing 2007 *Williams* case as "set[ting] forth the standard the government must satisfy in order . . . [to use] the *Quarles* public safety exception."); *see also United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005)("In order for the public safety exception to apply, there must have been 'an objectively reasonable need to protect the police or the public from an immediate danger associated with [a] weapon.'")(citation omitted); *Blackmon*, 1998 WL 109992, at *2-3 (jail case discussing *Quarles* as applying to "the location of a gun").

<u>c. A Custodial Interrogation in the Prison Context</u>

*Miranda* applies in the prison setting. *See Mathis v. United States*, 88 S. Ct. 1503, 1504 (1968). However, corrections officers obviously need not administer warnings every time they speak

with an inmate; as with their non-incarcerated counterparts, inmates are entitled to *Miranda* warnings only if subjected to custodial interrogation. *See Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978)("[W]hile Mathis may have narrowed the range of possible situations in which on-the-scene questioning may take place in a prison, we find in Mathis no express intent to eliminate such questioning entirely merely by virtue of the interviewee's prisoner status."). In place of the normal "freedom of movement" standard, courts use a "restriction of movement" standard to determine if a prisoner was in custody; thus, courts "look to some act which places *further limitations* on the prisoner." *See United States v. Cofield*, No. 91-5957, 1992 WL 78105, at *2 (6th Cir. Apr. 17, 1992)(emphasis added); *see also United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985)(adopting the *Cervantes* determination of "whether the inmate was subjected to more than the usual restraint on a prisoner's liberty to depart").

Since restriction of movement is a "relative concept," courts utilize four factors to determine if "some act . . . place[d] further limitations on the prisoner." *See Cervantes*, 589 F.2d at 428; *see also Garcia v. Singletary*, 13 F.3d 1487, 1492 (11th Cir. 1994)(examining "the totality of the circumstances surrounding the alleged interrogation" to ascertain the existence of an "additional restraint"). The four factors consist of "the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him." *See Cervantes*, 589 F.2d at 428; *see also Cofield*, 1992 WL 78105, at *2-3 (articulating and applying the *Cervantes* factors). Using this test, courts weigh the evidence "to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting." *See Cervantes*, 589 F.2d at 428.

d. "*Miranda*-in-the-Middle"

The Supreme Court twice has addressed suppression of statements made in a *Mirandized* interview that chronologically followed the making of previous unwarned custodial statements. *See generally Missouri v. Seibert*, 124 S. Ct. 2601 (2004); *Elstad*, 105 S. Ct. 1285. In both decisions the Court refused to extend the Fourth Amendment "fruit of the poisonous tree" doctrine to the *Miranda* context. *See Seibert*, 124 S. Ct. at 2610 n.4 (noting the Court's earlier rejection of the "fruit of the poisonous tree" doctrine in *Elstad*). Instead, the Court resolved each case by weighing the evidence surrounding the interrogations in accordance with a set of factors. *See id.* at 2612 (plurality opinion) (describing the "series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object"); *Elstad*, 105 S. Ct. at 1293 (articulating the factors that bear on the voluntariness of the later, post-*Miranda* interrogation).

In *Elstad*, the Court faced a factual scenario in which police executed an arrest warrant, placed the suspect under arrest, spoke with the suspect in his living room before providing *Miranda* warnings, and received some information from the suspect concerning his presence at the robbery in question. *See Elstad*, 105 S. Ct. at 1288-1289. Following the exchange in the suspect's home, police transported the suspect to the station, read him the *Miranda* warnings, and received a full, non-coerced statement concerning the robbery. *See id.* at 1289. While the Court excluded the pre-*Miranda* statement, it admitted the post-*Miranda* statement, concluding that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *See id.* at 1296. Thus, if the prior statement was an "unwarned but clearly voluntary admission," a later statement will be admissible if police adhere closely to *Miranda* vis-a-vis said later statement:

> In these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will."

*See id.* at 1294.

If the prior statement was coerced, the question becomes whether any coercion "carried over into the second confession." *See id.* at 1293. The Court stated that the appropriate inquiry in such a situation centers on whether the post-*Miranda* statements were nonetheless voluntary under the following factors: 1) passage of time between the first and second confessions; 2) change in location of interrogation; and 3) change in interrogator identity. *See id.*; *see also Seibert*, 124 S. Ct. at 2619 (O'Connor, J., dissenting)("*Elstad* commands that if [the defendant's] first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances[.]").

Deliberate *Miranda* subterfuge may change the analysis. Faced with an **intentional** procedure[4] of "question first, then give the warnings, and then repeat the question" until the interrogator secures in substance the same pre-*Miranda* statement, a plurality in *Seibert* diverged from *Elstad*. *See Seibert*, 124 S. Ct. at 2606. In this case, the arresting officer received instructions not to read the *Miranda* warnings to the suspect. An officer at the station then questioned the suspect for 30-40 minutes, obtained a confession, gave the suspect a twenty-minute break, read the *Miranda*

---

[4] In *Seibert*, the officers admitted that they used the question-first technique intentionally. *See Seibert*, 124 S. Ct. at 2610. The Court noted this anomaly, stating "Because the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work." *See id.* at 2613 n.6. This statement indicates that, at least for the plurality, this decision does not alter the Court's adherence to objective analysis in the *Miranda* context.

warnings, and used the pre-warning statements to obtain a warned confession. *See id.* Stating that the "object of question-first is to render *Miranda* warnings ineffective," the plurality structured its analysis to determine "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *See id.* at 2610. The *Seibert* plurality's effectiveness test focuses on the following five factors: 1) completeness and detail of the initial interrogation; 2) overlap between the two statements; 3) timing and setting of the two interrogations; 4) continuity of interrogating personnel; and 5) degree to which the two interrogations were continuous. *See id.* at 2612.

Thus, the analysis effectively treats the interrogation course as "parts of a single, unwarned sequence of questioning." *See id.* at 2610 n.4. However, *Seibert* was a 4-1-4 decision, with Justice Kennedy providing the fifth vote on the result. Justice Kennedy's opinion, narrower than the plurality, would diverge from *Elstad* only in the case of a "deliberate violation" of *Miranda*. *See id.* at 2615. In that instance, authorities could use the post-warning statement only by demonstrating sufficient "curative measures . . . designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *See id.* at 2616.

**III. Analysis**

a. Interviews without *Miranda* Warnings

Three corrections officers questioned Defendant Phillips shortly after the incident of July 2. All three officers failed to read *Miranda* warnings before interrogating Phillips. During the suppression hearing, the United States conceded that each USP McCreary officer custodially

interrogated Phillips. *See* Tr. at 225. The Court credits the Government for this candid assessment,[5] which squares with the custodial interrogation factors: 1) summoning language; 2) physical surroundings; 3) confrontation with guilt; and 4) additional restrictive pressure exerted.[6] *See Cervantes*, 589 F.2d at 428. Thus, absent the *Quarles* exception, *Miranda* would bar use of Defendant's statements secured by Long, Rivera, and Burchett.[7]

---

[5]

The Government's concession and the Court's custodial interrogation finding eliminate any need for the Court to evaluate application of "on-the-scene" questioning cases, discussed by Movant. Questioning "on-the scene" is generally non-custodial and thus does not invoke *Miranda*. *See Garcia* 13 F.3d at 1491. Here, all questioning was custodial interrogation, and the United States did not pursue an "on-the-scene" theory.

[6]

Defendant Phillips clearly was in custody when Long interrogated him. Upon reaching the scene of the assault, Long and other responding officers ordered Phillips to the ground. Corrections officers detained and handcuffed Defendant at the scene of the incident and escorted him to the lieutenant's office. *See* Tr. at 26. When Long questioned Phillips, the latter was restrained, seated in the floor, and surrounded by at least two other officers. Furthermore, Long's questions centered upon Phillips's involvement in the assault, which Long had witnessed. *See id.* at 37-38. Taken together, these facts encompass all four custody factors; thus, the Court finds that a reasonable person in Phillips's position would have believed he had been further restrained.

Phillips also was in custody at the time Rivera questioned him about the alleged assault. In accordance with procedure, officers transferred Defendant to a holding cell in the SHU to await permanent placement in the "jail within the jail." Rivera asked another officer to bring Phillips to the counselor's office for questioning; the record does not state definitively whether Phillips knew why he was removed from the holding cell. *See id.* at 106. During the interview, Phillips sat across from Rivera at a table and remained handcuffed behind his back. Rivera, who had been present at the scene, asked questions similar to Long's regarding the purpose and scope of the alleged assault. *See id.* at 107-108. Again, under these circumstances, a reasonable person would have felt further restrained; Phillips clearly could not depart the interview on his own volition.

The interview conducted by Burchett presents a different scenario insofar as Phillips, by that time, was officially assigned to the SHU. However, restraint is a relative concept, and Defendant had spent little more than a night in special housing at the time Burchett questioned him. Phillips still was transitioning into segregation, and the circumstances surrounding the interrogation were substantially similar to those of the Rivera interview. *See id.* at 142. Burchett questioned Phillips, physically restrained at the time, about a crime and confronted him with evidence of guilt. Defendant reasonably viewed himself as in custody. Therefore, the Burchett interview also was custodial.

[7]

Later statements spontaneously made by Phillips to Long in the SHU's recreation yard do

12

b. *Quarles*

The United States argues that the questions asked by the officers fell within the *Quarles* public safety exception to *Miranda*. Having examined the record in light of relevant case law, the Court finds that *Quarles* does not apply in this context.

The Court readily acknowledges that the prison environment is distinct, and law enforcement within that unique milieu faces continuous risks and pressures. Here, each of the USP officers testifying sincerely depicted inmate and institutional safety as a key motivator in questioning Phillips. Each officer had legitimate concerns about, *e.g.*, a) possible retaliation against the Defendants; b) the possible role of gang violence in the event; and c) intelligence indicating brewing unrest related to dining hall dynamics in the prison. *See, e.g.,* Tr. at 57 (Long: "I interviewed him or asked him those questions to see if I had a larger problem on my compound[.]"); *id.* at 93 (Rivera: "I was basically trying to find out whether or not it was, like I said, a larger scale situation, see if there was a gang affiliation, see who sanctioned the situation here or if it was a group, or if something bigger was going to arise out of the situation."); *id.* at 149 (Burchett: "My main objective, I guess, was to see why the assault occurred, just to make sure that there weren't going to be retaliation or, like I said, any further-reaching effects or problems with security in the institution."). Indeed, the prison had information that raised concerns about coordinated or gang-affiliated activity relative to the time around the assault. *See id.* at 147, 202-04. Thus, the Court accepts that a central motivation for all three officers involved safety, and the officers were not exclusively seeking information pertaining to a criminal investigation. The questioning involved two purposes –

---

not fall within this ruling. Phillips made no argument to suppress, and the statements resulted from Phillips's own volition, not questioning by Long. *See* Tr. 47-49; *see also United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997) (noting inapplicability of *Miranda* "where a defendant makes a voluntary statement without being questioned or pressured").

13

prospective safety, as might be implicated by group involvement, and historical responsibility related to the particular assault.

Under the *Williams* case, however, *Quarles* simply does not encompass the concerns legitimately held by USP McCreary officials at the time. *Williams* limits *Quarles* to exigencies centered on weapons. Again, per the Sixth Circuit, "The public safety exception applies if and only if both of those two conditions are satisfied" [*i.e.*, an officer must have reason to believe "(1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it"]. *See Williams*, 483 F. 3d at 428. A reasonable fear of additional imminent criminal activity is of a different character altogether from a reasonable fear that a suspect has or just had a weapon that he, another, or the public could use or encounter in a dangerous manner. *Quarles* speaks to the latter exigent scenario. A general *Miranda* exception encompassing the former scenario, espoused by the Government, could substantially empty *Miranda.* This is particularly so in the prison confines, where authorities may often operate under a reasonable apprehension of danger. If *Quarles* extends that far, the Sixth Circuit will have to retreat from *Williams* and say so.

Under the facts of this case, Defendants allegedly carried out the assault by hitting the victim with their fists and kicking him with their feet. *See* Tr. at 26. Furthermore, nothing in the testimony of Long and Rivera, both of whom arrived at the scene, indicates that the responding officers believed either Defendant had possessed and/or discarded a weapon that could have been picked up by any of the surrounding inmates. The Court acknowledges the constant concerns for safety and security in the prison setting. However, per *Williams*, absent reasonable suspicion of and valid risks concerning a weapon, *Quarles* does not and cannot apply to spare the statements from operation of *Miranda*. This Court must follow, not announce, *Miranda's* contours as determined by higher

courts, and *Williams* forecloses the Government's argument here.[8]

### c. Interview with FBI Special Agent Walsh

As previously stated, SA Walsh interviewed Defendant six days after the last interview with a corrections officer. Per Walsh's testimony, he did not visit USP McCreary specifically to meet with Phillips; rather, he came to review a number of cases that prison officials thought warranted FBI intervention. *See* Tr. at 183-84. After reviewing prison intel regarding the possible reasons for the alleged assault, Walsh decided to interview Phillips. *See id.* at 185-86. Upon meeting with Phillips in a SHU office, Walsh, in a methodical manner, identified himself to Defendant, read to him the *Miranda* warnings, obtained a waiver, and asked Phillips to tell his version of the incident of July 2.[9]

---

[8]

The Court notes that the exigency described, although pursued in good faith by all three USP witnesses, decreased sequentially over time. Lt. Long, therefore, could make the best case for a *Quarles*-type exception – he confronted the immediate situation and articulated an urgent need for information about the assault in order to assess institution-wide safety. However, by the time SIS Technician Rivera questioned Phillips, the prison, via Lt. Long, already had determined that the assault was not part of a large-scale event, and USP McCreary had determined not to lock down the facility. *See* Tr. at 68, 71 (Long testifying decision made within 15-20, at most 30 minutes of assault and not made with input from Rivera); *id.* at 87 (Rivera agreeing that he did not interview Phillips for 30-45 minutes after the assault). Thus, Rivera's basis for any public safety exception presents a greatly diminished exigency. Lt. Burchett's is even more attenuated; he did not interview Phillips until the next day. As such, even if *Quarles* applied, only Lt. Long would present a case aptly warranting an exception.

Finally, the Court does note some concern over *Miranda* awareness at USP McCreary. SIS Technician Rivera reported no real training or experience with *Miranda* and demonstrated misconceptions with the bases and applications for the *Miranda* requirements. *See* Tr. at 101, 104-05. Despite the SIS's defined role in criminal investigations at the prison, none of the SIS-related witnesses indicated frequently (in Rivera's case, ever) giving *Miranda* warnings, despite many recent criminal investigations. The Court would simply point out, again, that *Miranda* and its constitutional requirements do apply to the prison population.

[9]

On cross-examination, defense counsel questioned whether Walsh actually provided the *Miranda* warnings. Specifically, counsel noted that the reports summarizing Walsh's interviews with Phillips, Hughes, and Thiemig contained the same initial paragraph, regarding the interview outset

15

But for the earlier interrogations, which transgressed *Miranda*, the Court's only task would have been to determine if Phillips knowingly, intelligently, and voluntarily waived his rights. However, the record indicates that prior to the interview Walsh spoke with Burchett and, at the very least, cursorily read over the reports submitted by Long and Rivera; all three officers obtained their information through improper custodial interrogations. Because of the prior interviews, the Court must examine the Walsh interview in accordance with *Elstad* and *Seibert* standards.

The Court is troubled by a suggestion of confusion and misapplication (or non-application) of the *Miranda* warnings at USP McCreary. During his testimony, Lt. Burchett stated that he provided *Miranda* warnings only twice in the last 18 months despite having conducted "[m]any more than two" criminal investigations as an SIS Lieutenant. *See* Tr. at 162. More alarming was the testimony from Rivera, who seemed to lack understanding in the proper use of the warnings. *See id.* at 101-102. An SIS technician for about a year, *see id.* at 77, Rivera testified that not only had he never given the *Miranda* warnings in the course of any investigation, *see id.* at 103, but also that he had observed several other criminal interviews without ever seeing another SIS officer provide the warnings. *See id.* at 105. Rivera later stated that he was instructed to read the warnings if the purpose of the questioning was to get a confession but not merely when assessing institutional security needs.

---

and *Miranda*, "word-for-word . . . [without] a single comma that varies from one to the other." *See* Tr. at 199. Because the paragraph summarized Walsh introducing himself, reading *Miranda* warnings, and obtaining Phillips's waiver, counsel accused Walsh of including it simply "to cover [himself] in the event that [he's] ever questioned about whether [he] gave someone their *Miranda* warnings, whether they understood that [he was] an agent of the FBI and whether they understood their rights[.]" *See id.* at 200. When confronted with this accusation, Walsh responded that he included the information in the report because it was "exactly what happened," explaining that the paragraphs were the same because "the exact same steps happen for each interview." *See id.* at 200, 201. The Court finds no basis for defense counsel's insinuation and accepts fully Agent Walsh's explanation. A regular interview checklist, adhered to by an agent, is a proper mechanism to protect against arbitrariness, indeterminacy, and constitutional violations.

16

*See id.* at 130. However, the existence of custodial interrogation does not turn on the subjective intent of the interrogating officer. Rather, courts examine the totality of the circumstances to determine, in the prison context, if "a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting." *See Cervantes*, 589 F.2d at 428.

Despite these concerns, the Court does not find that USP McCreary confusion over the proper use of *Miranda* warnings amounted to employment of the question-first tactic *Seibert* strongly decried. The questioning did largely focus on institutional safety (not prosecutorial) priorities, and failure to adhere to *Miranda* resulted from inadvertent mis-perceptions about the decision's contours, not calculated evasion. As such, *Elstad* would apply, at least under Justice Kennedy's concurrence. However, because confusion exists "about whether the plurality or concurring opinion [of Justice Kennedy] controls," *see Pacheco-Lopez*, 531 F.3d at 427 n.11, the Court will review the statements under both *Elstad* and *Seibert*.[10] Because the Walsh interview survives both standards, the Court need not determine which opinion constitutes the holding in *Seibert*.[11]

---

[10]

In *Seibert*, a fair reading of the plurality opinion reads as a gloss on, and therefore a replacement of, the standard articulated in *Elstad*. *See Seibert*, 124 S. Ct. at 2610 n.4 (discussing *Elstad* in terms of effectiveness of *Miranda* warnings). However, in his concurring opinion, Justice Kennedy, who provided the fifth decisional vote, indicated that the *Seibert* effectiveness analysis should apply "only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *See id.* at 2616 (Kennedy, J., concurring). In all other cases involving two-stage interrogations, Justice Kennedy would apply the *Elstad* standard. *See id.*

[11]*See also United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006)("This Court applies the *Seibert* plurality opinion as narrowed by Justice Kennedy. . . . Once we determine the *Miranda* violation was not deliberate, we must fall back on *Elstad* as instructed by Justice Kennedy."); *Pacheco-Lopez*, 531 F.3d at 427 ("Most circuits have assumed that Justice Kennedy's concurrence operates as the controlling precedent[.]").

Under *Elstad*, the Court finds that Phillips's statements to Walsh are admissible. First, Phillips at no point argued that he made statements to the USP officers under coercion. *Miranda* noncompliance and coercion are distinct concepts, *see Elstad*, 105 S. Ct. at 1293-94, and the defense has not contended that the officers violated due process or overrode Phillips's will with respect to the statements.[12] Thus, under *Elstad*, the post-warning statements would be admissible if Walsh properly complied with *Miranda*. The interview occurred a full week after the incident, Walsh provided detailed warnings, and Walsh testified that Phillips willingly provided a statement. *See* Tr. at 204 ("[H]e wasn't intimidated. He seemed, you know, rather intelligent and sharp. . . . he didn't seem like he was really worried about what was going on."). The only evidence of record is that SA Walsh gave a "careful and thorough administration of *Miranda* warnings," *see Elstad*, 105 S. Ct. at 1294, and as such, the Court finds Phillips's waiver proper under *Elstad* as it here applies.

If the prior statements were coerced, however, the Court would determine "whether the taint dissipated through the passing of time or a change in circumstances." *See Seibert*, 124 S. Ct. at 2619 (O'Connor, J., dissenting)(discussing the *Elstad* factors of passage of time, change in location of interrogation, and changed identity of interrogator). According to the record, six days passed between the Burchett interview and the Walsh interview. Before asking any questions, Walsh identified himself, read the full *Miranda* warnings, and gained intelligent waiver. Even though Walsh, with SA King, interviewed Phillips in one of the offices in the SHU, the record suggests that Burchett merely escorted the parties and did not actively participate in the interview. Based on the

---

[12] Indeed, Phillips refused to provide much, if any, information to Lt. Long. The Long interview was potentially the most coercive, yet Phillips easily resisted talking, even without *Miranda* warnings.

passage of time and the changed identity of the interrogator, the Court, therefore, finds that Phillips made a voluntary statement to Walsh.

Defendant's statement is similarly admissible under the *Seibert* plurality's effectiveness analysis. To reiterate, the factors for effectiveness are: 1) completeness and detail of the initial interrogation; 2) overlap between the two statements; 3) timing and setting of the two interrogations; 4) continuity of interrogating personnel; and 5) degree to which the two interrogations were continuous. *See id.* at 2612. The three prior interviews were short and cursory, focusing only on assault motivation and possible gang-affiliation. *See* Tr. at 38 (Long: testifying that he spoke with Phillips for "[m]aybe ten, 15 seconds" regarding the scope of the incident); *id.* at 94 (Rivera: testifying that he interviewed Phillips "somewhere in the lines of five to 15 minutes"); *id.* at 157 (Burchett: testifying that he spoke with Phillips for "maybe ten minutes"). The statement to Walsh was dramatically different, in content, scope, and detail. Factors three, four, and five also clearly favor effectiveness. As previously noted, Walsh interviewed Phillips six days after the Burchett interview. Furthermore, even though the settings were similar, no corrections officer participated in the Walsh interview. Additionally, Walsh encouraged Phillips to tell his side of the story and confronted him only with the existence, not the content, of the earlier unwarned statements. Phillips's demeanor to Walsh was calm and confident. He provided a version of events distinct from the prior statements, a version Walsh saw as rehearsed. Further, the Court must note, as a convicted felon in prison, Defendant obviously has some familiarity with the system and his constitutional rights. Therefore, under the totality of the circumstances, the Court finds that the *Miranda* warnings were effective, per *Seibert*. The FBI interview was a distinct event – in time, circumstances, format, and personnel – and Walsh's *Miranda* compliance produced a valid waiver.

**Recommendation**

For the reasons discussed herein, the Court recommends the following:

1) that the District Court GRANT Defendant Phillips's motion to suppress statements he made to Lieutenant Long, Technician Rivera, and Lieutenant Burchett; and

2) that the District Court DENY Defendant Phillips's motion to suppress statements made to SA Walsh.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As defined by § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within ten days after being served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for de novo consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 31st day of December, 2008.

Signed By:
Robert E. Wier  *REW*
United States Magistrate Judge